We'll hear argument first this morning in Case 10-699, Zivotofsky v. Clinton. Mr. Lewin. Mr. Chief Justice, and may it please the Court, in its recent decisions in Medellin v. Texas and in Hampton v. Rumsfeld, this Court approved and applied the familiar tripartite scheme that Justice Jackson articulated in the steel seizure case. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb. In that instance, said Justice Jackson, his claim to a power at once so conclusive and established by our constitutional system. Well, Mr. Lewin, what power is Congress exercising here? Justice Kagan, Congress has exercised its power over passport, the issuance of passports under the immigration, naturalization, and foreign commerce powers that Congress has. It has enacted passport legislation back in 1856. In 1926, it can control what the contents of a passport are to be, what its duration may be, how the application is to be made. And we say this is an identification portion of the passport. Do you think it's relevant that the title of Section 214 is United States policy with respect to Jerusalem as the capital of Israel? Well, we think, and we've cited, I guess, in footnote 2 of our brief, a number of recent cases of this Court that have said that you take each statutory provision independently and determine its constitutionality. True, Congress has a broader view with regard to the policy of Jerusalem being part of Israel than the executive branch has had since 1948. However, that purpose is not determinative of what the constitutionality is of subsection D. Moreover — But you say, Mr. Lewin, that you're not claiming exclusivity in Congress. You say foreign relations is a shared power. So if it is a shared power, why does Congress trump the executive? Because precisely because under the standard of the steel seizure case and this tripartite scheme, if Congress determines that what the President has done, and this is a statute which is really very narrow and deals with past conduct by the executive branch, as it were, it does not hobble the President in terms of future foreign policy. Well, under your theory, and this is just following on Justice Ginsburg's question, I think, under your theory, what foreign relations determinations are for the President alone to make? Foreign relations determinations are not left to the President alone. Are there any foreign relations determinations that are for the President alone to make under your theory of the case? Yes. And those are? Those are diplomatic communications. In other words, it's the President who makes— In other words, who gets the telegram or something? Well, who issues the communication to the foreign government, who determines there are certain things that the President alone does because he's the one who implements foreign policy. Is there any treatise writer or decision of this Court that supports such a narrow, crabbed interpretation of the President's foreign affairs power? Well, with all respect, Justice Kennedy, we don't think it's crabbed. We think that that is exactly what Justice Jackson was referring to, and that's what this Court has said in the Medellin case and in Hamden as well, that if Congress does not authorize— The famous division he had, I think, assumes the validity of the congressional statute at the first step of inquiry. And here, that's the whole question. I don't know whether it's limited to the assumption with regard to the congressional statute. If Congress says, as it did in this case, we disapprove of the State Department's view that passports should not contain the identification of Israel for people who were born in Jerusalem, that is Congress disapproving of what the State Department and past State Department policy. Mr. Lewin, you were cut off earlier when you were saying this reading doesn't hobble the President in the future. It says anybody born in Jerusalem can have Israel listed, correct? What happens if there's a peace accord tomorrow and Israel gives up any claim to sovereignty over Jerusalem? Is the President free to stop listing Israel on the passport, or does he have to wait for Congress to change the law? I think he does have to wait for Congress to change the law. So you are hobbling the President with respect to situations that occur frequently, as happened in Egypt, sometimes overnight. No, but it may in some way, in a very remote possible way, I mean, I think under those circumstances, if there were a peace treaty and if Jerusalem were handed over to a Palestinian State, I think Congress would repeal the statute. That's the point. Congress has the power, has the authority under the Constitution to enact laws, and it is Congress that makes the decision, even with regard to foreign policy issues. The Constitution requires ambassadors to be appointed with the consent of the Senate. It gives Congress the power of the purse. So why don't, why isn't the better view that we let Congress express its approval and disapproval in the mechanism set up by the Constitution to do so? Meaning, if the President recognizes a country that Congress doesn't want it to recognize, it can withhold approval of an ambassador. It could refuse to fund the embassy. It could do many other things. But what entitles Congress to trench on a presidential power that's been exercised virtually since the beginning of the country? With all respect, Justice Sotomayor, I think history demonstrates that that's simply not true, that in fact Congress has had equal, quote, recognition power, if in fact that's a power rather than a ceremonial duty. We have in our reply brief gone through the fact that from Presidents Monroe, Jackson, Taylor, Lincoln, and even at the time of President McKinley, Congress said we have the authority to be recognized, or recognized. Kagan, this gets back to the question of exactly what congressional power you're basing your argument on. You started by saying you were basing it on Congress's passport power, which is a function of its control over immigration issues. Now you're saying Congress has a co-equal recognition power. Which is it, or is it both? No, in the alternative, Justice Kagan, it is both. We submit, first of all, there is no exclusive recognition power in the President, if there is a recognition power, and we spell that out. Does that go the full length of saying if Congress passed a law that says the United States recognizes Jerusalem as the capital of Israel, and Jerusalem must be designated as the capital of Israel in all official documents, suppose that were the law, I take it from everything you argued, your position would be yes, Congress has that authority. Well, we say Congress has that authority, but I have to add, Justice Ginsburg, that Congress has been very careful in the past, and we believe it will be in the future, to give the President broad authority. To the extent Congress has tried to do that, Congress has consistently said that the President can waive the moving of the embassy to Jerusalem, because Congress recognizes this is one of these very rare situations where Congress has said what the President has done and what the Department of State has done is simply wrong. Mr. Lewin, it seems to me you're not arguing for a co-equal congressional power, you're arguing for a superior congressional power. You're saying whatever Congress says, the President has to comply with. Now, that's quite different from saying that they both have authority in the field. And if they both have authority in the field and they're exercising it in different fashions, I frankly would not be inclined to intervene. I would let them conduct the usual interbranch hand wrestling that goes on all the time, which probably means that if Congress cares enough, Congress will win, because as you say, it has an innumerable number of clubs with which to beat the executive. But if the power is a co-equal power and they're both exercising it in a different way, why don't we just, you know, let them go at it? Why is it any of our business which is the better foreign policy position? We are not. The Court is not being asked to determine what is the better foreign policy position. Congress has determined and they Congress is supreme, then. That is your position. Not that Congress has co-equal authority with the executive, but Congress is supreme. No, there's two aspects to this, Justice Scalia. One is the recognition power. As to the recognition power, if it exists, Congress has it together with the President. But with regard to foreign policy and with regard to the question of whether Congress can trump the President, this is not a new proposition. The Court determined it in the steel seizure case. The Court more recently in approving Justice Jackson's tripartite scheme approved it in Medellin v. Texas. Roberts. Well, Medellin involved a situation where the President's purported exercise of authority changed domestic law, and not simply domestic law, but domestic State law. That seems to me to be quite a distinguishable circumstance. But what, again, what Justice Jackson said was that when the two are incompatible, then you look, the Court looks and scrutinizes, subjects to scrutiny. Those words are in Justice Jackson's standard. Scrutinizes what the President has done. And we submit in this case, if the Court were to look at the answers to the interrogatories in this case, what is the basis for the President's policy? If one scrutinizes it, we say in our brief it's, we call it trivial, because what happens is the Department of State has said, and again, this is important in terms of this statute, all that happens with this statute is that 50,000 American citizens have the same passport as 100,000 other American citizens who were born in Tel Aviv or Haifa. It just says Israel. It doesn't say Jerusalem, Israel. It just says Israel. And the State Department says that's justified because Arab countries or Palestinians may be upset if they misperceive. Roberts. So you're suggesting that the outcome of this case would be different from your perspective if Congress said you have to say Jerusalem, Israel? I say it's a different case, yes. Absolutely. In this case, what is the important thing about this case and this statute is that it gives the individual passport holder a choice. Why is it a different case? It's a different case because if it were to say Jerusalem, Israel, there would be more of an argument. Again, I'm not saying I would be here acknowledging that that's impermissible, but there would be more of an argument that it appears to be some official approval of Jerusalem, Israel. There would be a greater concern, the concern on the part of the executive that there would be adverse political reaction would have a greater degree of credibility. Somewhat greater degree, again. And so we're supposed to decide whether or not the executive is correct in saying that it's a significant problem. And he says, well, he says that, but we know foreign policy better. We don't think it's going to be a big deal. No. I don't think the Court is being asked to decide a question of foreign policy. Congress has decided that saying Israel alone does not present a foreign policy issue. Congress recognized that with moving the embassy, there might be a foreign policy issue. So they said that the President can waive that. With regard to this provision, Congress has said, no, there's not likely to be any foreign policy harm. And all that the Court is being asked to do is it's being asked to enforce the congressional conclusion, which is we submit exactly what the third level under Justice Jackson's test is, that if, in fact, Congress decides that what the President has concluded or the executive branch has concluded is wrong, it may, and it has the constitutional power to say, with regard to foreign policy, we can exercise our determination. Roberts I don't see Justice Jackson's analysis. What he's saying, and I guess I don't think it's as controlling as others might. He's saying when there's a conflict, it's a harder case. Yes. When there's — when they agree, it's an easy case. When you can't tell, it's sort of a middle case. I don't see how that's very helpful in resolving the dispute before us. Well, because he says that when it's in the third category, the Court has the obligation under those circumstances, if it's going to keep the equilibrium of the balance of powers, to look at what the President's justification is. The word scrutiny is in there. That's not simply a phrase that Justice Jackson has taken out of the air. He says you're supposed to scrutinize it. And if you scrutinize it in this case, there's nothing other than the possibility that there would be a misperception by Palestinians. That's what the State Department is saying. What were we scrutinizing in the steel seizure case? I think in the steel seizure case, the Court was scrutinizing whether, notwithstanding the fact that Congress did not give the President the power to seize steel mills, nonetheless, whether there could be some justification that even in — contrary to Congress's wishes, the President would be able to exercise that power. And in what presidential power would have supported that? The war power? Possibly the claim that as Commander-in-Chief in the time of the Korean War. Right. He was claiming that the Korean War required that these companies remain in business. And I guess we did scrutinize that. What did we conclude? I think the Court concluded that, no, that that did not justify the exercise of the President's power, even though it was — But that wasn't a case — that wasn't a case in which the Congress had said, you may not seize mills. And that's what your case is. So there's a difference. Well, but that's an a fortiori situation, Justice Kennedy. If Congress didn't even say you may not seize steel mills, but simply because they didn't give the President the terms of the authority — It is if you assume that the statute is valid. Well, but the statute in this case — again, I come back to the fact that the statute in this case is a passport statute. If the statute is — if the statute is invalid, we're in Category 1. Yes, but — Or 2. But the statute in this case is a — on its face, a passport statute. There's no reason — But it's a passport statute. It's an identification. I'm sorry. It's a passport statute that seems to have nothing to do with the immigration functions that passport statutes usually serve. It seems to have everything to do with Congress's declaration of a foreign policy as opposed to Congress's exercise of power relating to immigration control. So convince me that I'm wrong on that. I think you are wrong on that, Justice. And let me explain why. Let me explain why. Because it is clear from the history of this line on the passport that it is purely an identification of the individual. It is not an exercise of any foreign policy. Indeed, the passport statute itself says that a passport is any travel document issued by competent authority showing the bearer's origin, identity, and nationality. And in this case, the history of this line on the passport demonstrates, I think, conclusively, and the State Department has acknowledged it, that it is purely a means of identification. And what Congress has said is, with regard to these citizens, we will permit them to identify themselves like Congress permitted the Taiwanese to identify themselves. But are you suggesting Congress enacted this because they thought that if these individuals' passports simply said Jerusalem, there would be an identification problem? Not because — Justice Alito, it's not because there would be an identification problem, but there was. Congress recognized that with regard to the 50,000 people who have a passport that says Jerusalem, they are being denied a certain sense of self-respect that they feel they should be able to have in terms of their own identification. This is not a statute that's designed to create some political brouhaha or make a foreign policy statement. It's a statute that, frankly, fits in with what the State Department does in accommodating to individual passport holders. The State Department says if you're a Palestinian or an Arab and you're born in Haifa and you don't like seeing Israel in your passport, we'll allow you to eliminate Israel from your passport. And all that Congress has said is — That might be true, Mr. Lew. And I think you would have a better argument if this statute said if you were born in Jerusalem, you can pick anything you want in your passport. You can pick Jerusalem, you can pick Israel, or you can pick Palestine. But the statute, in fact, doesn't say that. It says you can pick Israel. So why isn't that a statement of foreign policy as to recognition that Jerusalem is the capital of Israel, as opposed to what you're characterizing it as, which is a freedom of, you know, a sort of choice provision? I think that's — what you said the statute doesn't say, Justice Kagan, is exactly what the statute does say. The statute does say that the individual passport holder can choose to say Israel or can keep it as Jerusalem. And if he's born before 1948, he can say Palestine. So it is an individual passport holder. Well, you have to be very old to say Palestine. Pardon? Pardon? Not all that old. It's — I guess it's a reflection on my own seniority that it's my generation that fits into that. But the fact is exactly. Our point is that that's all that the statute does. The statute is a means of permitting self-identification by an American citizen who says, my birth in Jerusalem, indeed in West Jerusalem, which has always been recognized to be part of Israel, I want to call — I want my passport to say Israel. But it's recognizing that principle only with respect to a particular jurisdiction. An American citizen born in Northern Ireland doesn't have this option because he thinks that's part of Ireland. No, but an American citizen born in Taiwan apparently does have that option, even though the United States says we don't recognize Taiwan as an independent country. And your friend on behalf of the United States says that's because of a State Department judgment that in one situation it's significant, in the other it's not. Well, it's — no, it's not just because — it's because what happens is there is a recognition in both cases that it is a personal identification choice with regard to what goes on the passport. Sure, in that case the State Department didn't take it to litigation, although I submit that had they chosen to litigate that case, they would have a stronger position that they have in this case. But a personal identification choice can also have significant foreign policy implications, can it not? Is that an either-or situation? What the State Department is saying is to allow this particular personal identification choice may antagonize some foreign nations that we don't want to antagonize. What if they gave them the choice of saying, Israel, the only democracy in the Middle East? Okay, that's their choice. They can have that on their passport. Would that be okay? I have to say that given this Court's view about Congress's power with regard to A, passports, and again, I go back to the fact that in Zemel and Rusk, in Hague and Aggie, in Kent v. Dulles, in all these passport cases, this Court said we look to see whether what the President does is authorized by Congress, whether implicitly or otherwise. So that I submit that with regard to passports, you need the congressional authority, whether it's implicit or express. And with regard to your question, Justice Scalia, yes, Congress could, in an exercise of its passport authority, say here is what the passport has to say. It would be a foolish statute. But this Court has said, and I think you, Justice Scalia, have said it many times, it's not the Court's job to determine whether Congress is foolish or not. If Congress decides that, look, somebody born in Israel, a passport should say Israel the only democracy in the Middle East, Congress can say that. Congress has passport authority. And this has to do with the contents of the passport. Ginsburg. What you've argued is you're skipping over the question that the D.C. Circuit decided. I take it your view is it's not a political question, so the Court should resolve the merits. Our view is it's not a political question because it is like many other questions that affect foreign policy. And the Court said in Baker and Carr, not every decision that touches on foreign affairs or foreign policy is a political question that can't be determined. It arguably, according to the government, disaffects foreign policy. We say it is simply Congress having passed a statute which either is unconstitutional — we say it is constitutional — either is unconstitutional, or the Court should simply enforce it, like in the Japan whaling case. In the Japan whaling case, this Court rejected the claim that the outcome of a determination by the Court might very well affect foreign relations, and it said it's not a political question. I'd like to reserve the remaining time for rebuttal. Thank you. Thank you, Mr. Lewin. General Verrilli. Mr. Chief Justice, and may it please the Court, the Executive has determined that the passport's issues should not identify Israel as the place of birth for persons born in Jerusalem. Petitioner seeks relief under Section 214d that would countermand that executive judgment. But under the Constitution, that is an exercise of the Executive's exclusive recognition power. The Constitution commits that power exclusively to the Executive, and neither a court nor the Congress can override that judgment. Your friend documented contrary history at some length in his reply brief, where from the beginning, at least as he says, through the McKinley administration, the two branches acted as if they had co-equal authority. Mr. Chief Justice, if I might spend a minute or two on that history, because I don't think it shows what my friend suggests that it does. Before getting to the starting point of that story, which I think is the Monroe administration, I would like to point out that in the Washington administration the President confronted the question with respect to whether to recognize the revolutionary government of France, and President Washington consulted with his cabinet. And of course, his cabinet included Jefferson and Madison, Hamilton and Jay. And they decided that this was a power that was exclusive to the President to such an extent that they didn't even need to send a message to the Congress that they were going to recognize the new revolutionary government in France. Now, the second fact that I think is critical as a matter of history is that there is not a single piece of legislation that has passed both houses of Congress and come to the President purporting to recognize a foreign nation or a territorial boundary of a foreign nation. Alito, has there ever been an instance in which the President has recognized a foreign government over Congress's sustained objection? I don't — I can't think of an instance of Congress's sustained objection. I think probably the closest we would come is the revolutionary government of Mexico, which President Wilson first recognized on a de facto basis in 1915, on a de jure basis in 1917. Congress indicated displeasure with that. President Wilson sent his message to Congress saying that this is an exclusive executive function. Congress backed down. Breyer. Breyer. What are then the reasons that — because you're — Brent says that this is a force-your-eye case from everything, because all of these words, every time the word exclusive power has appeared in any source, I think that's what you're saying, it has meant that the President can act without supporting authority from Congress. But there never has been a case or a suggestion that the President can act where Congress has legislated to the contrary. Now, I think that's the argument. And so what — I would like to hear what you have to say about that argument. Verrilli, yes, I will answer that question directly. It is true that the Court has never before, with respect to the recognition power, confronted the question of whether the President is free to act in a manner different than a congressional command, because Congress has never purported to issue a command. That does not mean, however, that my friend is correct that this is a situation in which Congress has the authority to countermand or direct the decision of the President. This is, we submit, even if one thinks about this as a Youngstown Category 3 case, this is a Youngstown Category 3 case of the kind that Justice Jackson identified in footnote 4, where he cited Myers v. United States, the kind of case in Category 3 of Youngstown in which the President's judgment can prevail even over a contrary judgment of Congress as a case in which the President has exclusive authority. And that is the case. Breyer, my question is, what leads you to that conclusion? There are very, very few cases I can ever think of where the President — where the Court has said the President can act contrary to a statute. And so the point of my question was to get you to talk about why, even though this is a force. So I do think, if I could — I think it would be helpful in answering your question, Justice Breyer, if I could return to the Chief Justice's question about history. It's moving beyond that initial recognition by Washington that this is an exclusive power, which I think is quite significant. When we get to the Monroe administration, there is a fight between Clay and Monroe about whether the President has exclusive authority to recognize the new South American republics. Now, a couple of points there. I think the — what the only thing that one could point to as an action by the Congress that even implicates the recognition power is one House of Congress passed an appropriations measure for an ambassador. What the history treatise, the global treatise that my friend cites says on page 133, the very page that he cites in his reply brief, is that Clay's effort to contest the President's exclusive authority came to a, quote, inglorious end, unquote. He then goes on to say — my friend goes on to say, well, but a year later, when President Monroe sought to actually recognize these South American republics, he asked the Congress to join him in it. What he asked Congress for was an appropriation for an ambassador. But it was not the sending of an ambassador to the Republic of Columbia that was the recognition. It was when President Monroe received an ambassador from Columbia that constituted the recognition. And that was an exclusive act that he undertook without any consultation with Congress. Ginsburg. There are two examples that are given in the brief. One of Texas, where Petitioner says there was a case where Congress went first. Congress recognized and the President acquiesced. And the same thing with Taiwan. It was a statute and the President implemented it. So if the Congress thought it had the authority, the recognition authority in those two measures, then the President acquiesced. I'd like to address Texas, because I do think that's probably the most significant example that my friends identified. But even there, I think if one works through history, we'll see that it's an exclusive executive power. President Jackson in his first letter in 1836 to the Congress says essentially I hear you, you think we should recognize Texas. And then he says it's an open question as far as I'm concerned whether there's exclusive authority or not. It's not been something that the legislature has ever studied. But as a matter of expediency, he says, we don't need to resolve that question because I want to work with you. He then goes on to caution the Congress to not move too quickly for fear of precipitating war with Mexico, which I think, Justice Breyer, I'll try to return to a functional analysis later, and that's, I think, an important point. But I think what's important, Justice Ginsburg, is what Congress did next was to pass two appropriations measures, one in the House, one in the Senate. Each of those measures appropriates funds for an emissary to the Republic of Texas, but each includes language that says at such time that the President determines that it's appropriate to do so. If one looks at the page in the Congressional Globe that my friend cites, one will see that that language was added because as originally introduced, the appropriations riders were objected to by members of Congress on the ground that they infringed on the President's exclusive recognition authority. Roberts, if I could stop you and just have you address the political question of the doctrine. Roberts, you say this is exclusively committed to the President and, therefore, it is a non-justiciable political question. How is that different from saying it's our job to decide cases, it is justiciable, and then you can argue that the answer of that analysis is that it's exclusively committed to the President? I don't understand why labeling it a political question advances the analysis much. Verrilli, Jr. Well, I think we agree, Mr. Chief Justice, that there isn't a very great deal of difference. We acknowledge that in conducting the political question analysis, that it is for the executive, it is for the Court to decide the scope. We think that's what Nixon v. United States says. It's what Powell v. McCormick says. And that in answering those questions, we think that the Court will have gone a very long way to determining the question of the case. Ginsburg. Why not all the way? I mean, if the Court decides that the Constitution commits this authority exclusively to the President, then it's all over. That's the merits of the case. Does the President have this authority? So the political question label seems to be kind of a subterfuge, because if there is a textual commitment to the President, that's the end of the case, isn't it? Verrilli, Jr. Well, I do think that with respect to the First Baker v. Carr factor, the fact that textual commitment is a factor that the Court has indicated is one that can lead to the conclusion that it's a political question. I do think that the Court has to go through the analysis. And so at the end of the day, there may not be very much of a difference. Alito, Jr. Well, doesn't it depend on what the question is? In order to decide whether it's a political question, you have to identify the question. Now, if the question is whether the President has exclusive authority with respect to the formal recognition of a foreign country, that might be one thing. But what if the question is whether the President has exclusive jurisdiction with respect, has plenary authority, unreviewable authority with respect to anything that the President thinks has a bearing on the question of recognition? Now, if that's the question, is that committed exclusively to the President? Verrilli, Jr. No, Justice Alito. We don't — we think Powell v. McCormick and Nixon say that the question of not just the question of commitment, but also the question of scope are questions for the Court to decide. Now, we do think with respect to the question here that even though it's for the Court to decide, it's for the Court to decide with a very significant measure of deference, because when the decision by the executive with respect to how it's going to handle the status of Jerusalem and passports is a very sensitive and delicate matter. This position was arrived at after very careful thought, and it is enforced very carefully. And I think from that should come the lesson that this — and the reason is because the executive believes that the statement on the passport has to be understood as a manifestation of the President's exercise of the recognition power. Well, suppose, Mr. General Verrilli, suppose that this statute, there was the section that's there now, and then there was another section, and the section said, The recording of Israel as a place of birth on a passport shall not constitute recognition of Israel's sovereignty over Jerusalem. Would that be constitutional? I don't think it would change the analysis, Justice Kagan. I think — of course, that is not this statute, which has a title which says United States policy with respect to Jerusalem as the capital of Israel. But — but — But this statute has a title which says identification of persons born in Jerusalem. I still think that would be within the scope of the executive's power to decide, because the content of the passport, insofar as the executive believes that it constitutes an expression of an incident of recognition, is a judgment that the executive makes. Now, the Court can review that, but the Court's review of it should be done with a significant measure of deference, as the Court suggested in Regan v. Wall. Now, what is — Kennedy, that seems to me different than the rationale of the D.C. Circuit. It seems to me you're not defending the rationale of the D.C. Circuit. You said there's no jurisdiction. And it's always awkward for us to tell counsel what's in their best interest. But it does seem to me that your position would be much stronger if you said there is jurisdiction and the President wins. Well, we think — we do think that if there's jurisdiction, the President wins. But we do think that the D.C. Circuit acted appropriately in finding that the — Because if this — if this rationale remains the law and is the law, then you have the specter of constant legislative determinations that are not clearly — not clearly invalid. And it seems to me that's, again, with all due respect, not in the best interest of the ultimate argument you're making. Well, we appreciate that, Justice Kennedy. We do think that in resolving the political — in conducting the political question analysis, the questions that the Court would need to decide under Nixon and Powell would go a very long way to clarifying that problem. But if the Congress's statute said what you must put on the passport if we're going to have a political question, what you must request it is Israel, parentheses, disputed, close parentheses, which would seem to take care of your objection that people are going to look at this and draw a false conclusion. I don't think that changes the analysis, Mr. Chief Justice, because I think that that the — to the — to the — because it would — that would be, again, Congress seeking to direct a judgment of the — It is the position of the administration, isn't it, that the status of Jerusalem is disputed? That's correct, Mr. Chief Justice. But it — what the United States says about that in official communications — and remember, a passport is not a communication by the passport holder. It's an official United States document that communicates the position of the United States. So what if Congress says, in the place that you have it, this person has the choice of whether or not to put Jerusalem or Israel. This doesn't affect whether the United States recognizes Jerusalem as part of Israel or not. It's just his choice. Same problem? Same problem, Mr. Chief Justice. Really? I thought your argument was that someone's going to look at that and say that by — that it offends me that you're calling this part of Israel. That was the foreign policy significance. And I tried to give you a hypothetical in which nobody could reasonably draw that conclusion, and you say still, same thing. I do think that this is an area in which the executive has got to make the judgment, because it's of paramount importance that the nations speak with one voice. Then, General Verrilli, then you are taking the position that this is not a shared authority. It's an exclusive authority, that there is no role for Congress. Am I right? Or is there some role in recognition for Congress? We — our position, Justice Ginsburg, is that the recognition power is exclusive to the President. Scalia, what if — what if the recognition of a breakaway province of a foreign country by the United States will clearly provoke a war with that country? Would Congress have the power to decree that the President shall not recognize that breakaway province? Knowing that, if he does recognize it, that country will declare war on the United  Verrilli, I think, Justice Scalia, that's a situation in which the President would exercise that recognition power very carefully. Scalia, we have a foolish President. Contrary to our entire history, we have a foolish President. Verrilli, I think, although I don't — I just don't think that in a situation like that, the President would exercise a recognition power, but if — but if the President did, it's the President's judgment to make. Now, the — and I — Justice Breyer, if I could get back to your question in addition to the — Scalia, please stay on this. I am — I am willing — Our cases say repeatedly that the President is the sole instrument of the United States for the conduct of foreign policy. But to be the sole instrument and to determine the foreign policy are two quite different things. To say he's the sole instrument simply means that congressmen traveling abroad or globe-trotting ex-Presidents, nobody except the President of the United States pronounces the foreign policy. But it doesn't necessarily mean that the President determines everything in foreign policy. He's the instrument. But there is certainly room in — in those many cases for saying that congress can say what the — what it's — what the country's instrument is supposed to do. I think with respect to the question of recognition, Justice Scalia, that it is a power that rests with the executive. And I think in addition to the history, and we do now 220-plus years in our Constitution, do not have a single example of Congress actually exercising the power. And I think in addition to the history, there are very good functional reasons why that is so. And I think, Justice Breyer, in answering your earlier question, I think those are significant. The — the exercise of the recognition power depends, we think, on three things that make it clear that it needs to be exclusive. The first is timing. The second is expertise. And the third is a need for secrecy. Time — I didn't hear the third. The need for secrecy. Timing is, I think the Israel example shows, is of critical importance. But it's not just speed. Of course, Congress can't act with the dispatch needed in a situation like the recognition of Israel. But apart from that, a recognition that occurs too soon could send events in the direction that could be very disadvantageous to our foreign policy. A recognition that comes too late could — could squander an important opportunity in the national interest in the foreign policy realm. Kagan. General Verrilli, is the textual basis for your argument that the President has exclusive power here, is it the receipt of Ambassador's Clause alone, or is it something else? Because I was, frankly, a little bit surprised that your brief put so much weight on that the President has a purely ministerial function, and so little weight on any other power that the President has. Verrilli, So here's our position on that, Justice Kagan. We do think that the reception clause is the source of the recognition power. Hamilton identified it as the source of the recognition power in the Washington administration. I think it's now understood that it's Hornbook law that that's the textual source. But to the extent that there's a— Scalia, Yes, there is. I mean, if you've got to cast him out for something, I suppose, I don't know, what else you'd — you'd — you'd land upon. Verrilli, It is there. Scalia, Well, it is there. Verrilli, And in addition — I would say in addition, to the extent there is a question, we do think, as I think we indicated in our brief, that one can see this power as part of what the Court in Garamendi described as the vast share of responsibility that the Constitution assigns to the executive. Now, we don't think all of that vast share of responsibility is exclusive to the executive, but we think this responsibility is exclusive. Kagan So if that provision were not in the Constitution, would you be making the same argument you are now? Verrilli, If the reception clause were not in the Constitution, but we had the same history that we have now and the same functional considerations about the need for it being in the control of the executive, yes, we would. Alito There are many things that Congress could do to frustrate the President's decision to recognize another country. Now, would you say all of those are unconstitutional? They all infringe the President's exclusive recognition authority? Suppose the President decides to recognize a country and Congress refuses to appropriate any money for an embassy there or refuses to confirm any U.S. ambassador to that country. Those presumably would not be unconstitutional, would they? Verrilli, I think that there would be a difference between — I think that Congress has authority over appropriations. Congress has authority to appoint ambassadors. It's entitled to exercise that authority, and it's entitled to exercise that authority even if it's in tension with the President's recognition decision. It is the position of the executive, though, that there could be circumstances in which Congress could try to exercise its appropriations authority in a way that would preclude the executive from exercising its recognition power, and that the executive would, in some circumstances, believe that it had the authority to move ahead despite those actions by Congress. Of course, this is not a situation in which Congress has passed a sense of the Congress' resolution about what it thinks. It's not a situation in which Congress has exercised contention conditions to its spending power about what private parties do. This is an effort by Congress to regulate the content of a passport, which, as the Court recognized in Hague v. AG, is a core instrument of diplomatic communication. Alito, do you think that's an exclusive power, to determine the contents of passports? Hasn't Congress exercised that authority for a long time? We don't think that the entire content of passports is an exclusive power. I would, and I'll explain, Justice Alito, where we think the line is, but before doing so, I do want to push back a little bit on the notion that Congress has for a long time exercised authority over the content of passports. The first Passport Act was in 1856. What this Court said in Hague v. AG was that the enactment of that statute nearly confirmed a power that everyone understood to be inherent in the executive. That statute did not purport to regulate the content of passports. It, in fact, said that passports shall be issued under such rules as the President shall prescribe. And in Hague, that was that language, I think, that led the Court to conclude that this was a confirmation of the executive's authority and an action in aid of that authority. Now, I don't know. Breyer. I just don't want the time to elapse. You can finish that if you'd like. I'd just like somewhere a few words about the political question, which you don't believe in. From reading your brief, I would say you don't believe in it much. And my question on the political question for either of you is this, that this is an area of foreign affairs. It's an area of, you know, recognition. We know that. Never has this Court or anyone else held that Congress can go ahead in this area passports which both regulate. And our real problem is these are words that are officially said and they are detailed words, and those words may really disrupt coherent foreign policy. Viewed that way, there are billions of words that might have the same effect. And do we know that these words will and some other words won't? No. Judges don't know that. And therefore, when you get into this area, the best thing to do is avoid multifarious pronouncements by various departments of government on one question. Do not respect the views of other branches, and judges, stay out of it. Let them work it out by themselves. I just want a word from either you and really, Mr. Lewin, on that. Lewin, we do think that's what we think that the appropriate inquiry for political question purposes is into the relief that the Petitioner is seeking. And if the relief the Petitioner is seeking would invade the kinds of judgments that the Constitution commits exclusively to the executive, and the reason it commits these kinds of judgments exclusively to the executive is because this is a situation in which multifarious voices are inimical to the national interest.  Well, that's a merits determination. I mean, the whole question is who has the authority? And whatever label you put on it, if you decide that the President has, as you just said, the exclusive authority, that's the end of the matter. It's not leaving it, it is not leaving it, as Justice Breyer said, to the political branches to fight it out between them. It is saying the President has the exclusive authority. Well, I think in — I'm trying to put it this way, Justice Ginsburg. In the absence of Section 214, I think it would be clear from Pink and Belmont that this — that the judgment on recognition is exclusively committed to the executive, and it would be a political question if a party came in and said, I want my passport  General, the tension that I see here, and I think it's what Justice Breyer is getting at, is the label is important, because if we call this a political question and don't address the merits, the outcome is that the President is saying that he's entitled to ignore the Congress. I don't know what kind of message that sends, but it's a little unsettling that a court charged with enforcing the laws passed by Congress are basically saying, we're not going to determine whether this law is constitutional or unconstitutional. That's what your definition of political question is becoming, and where does that stop? Well, I — In what situations? Only in foreign policy do we decide not to? I think, Justice Sotomayor, it's actually quite narrow, and the problem isn't a significant one in the case of textual commitment, because the Court does, in reaching the conclusion as the D.C. Circuit did that it's a political question, the Court does have to decide whether there is a textual commitment to the executive here. So the Court would resolve that question. The Court would resolve the question of whether the conduct at issue here is within the scope of that textual commitment, so the Court would issue those rulings. But that's not what the D.C. Circuit did. You told Justice Kagan that it didn't — your position didn't depend upon a textual commitment, that your position would be the same if the Receive Ambassadors Clause were not in the Constitution. But I didn't mean to suggest it wouldn't be a textual commitment. It would be a commitment that one would read as the historical gloss on the vesting power, which is what Governor Miles said. It's not in the text. Well, I think it's the historical gloss on the vesting power is — functions as the equivalent of the specific textual commitment. Of course, we do have the specific textual commitment here. This textual commitment applies when somebody comes to the Court and asks for the Court to make the decision. If the plaintiff here had come in and, without a congressional statute to rely upon and had said, it is wrong for the State Department not to let me say Israel on my passport , then we would say, you know, textually committed to the executive. But this is a different situation where you have a dispute between the two branches. And where that happens, I find it hard to say, well, you know, we can't get into it because why? Because it's textually committed to one of the branches? It seems to me we have to resolve that question. Well, as I said earlier, or tried to say, we think that the analysis of the political question doctrine goes a very long way towards answering that question, Justice Scalia. We do think that this could be seen as a case like Gilligan, in which looking at the relief that the Petitioner is seeking, the plaintiff is seeking, leads the Court to conclude that this — that entertaining the claim would embroil the Court in decisions that are supposed to be made by another branch, and that, in fact, I think you can understand Section 214D as precisely that, an effort to try to draw the Court into this dispute between Congress and the executive over whether — section — over whether Jerusalem should be recognized as part of Israel. I'll give you a couple more minutes if my colleagues have any questions. Scalia. I wanted to follow up on that. Does that mean you're content to have this Court not say whether it's the exclusive executive power or there's some congressional participation? I mean, if we just abstain, will you say it's none of our business? It's none of our business. Let you two guys fight it out. That's not what you're asking us to do, is it? That's correct, Justice Scalia. You're asking us to decide the question that it is exclusively the presidential power. Yes, that is correct. Well, that doesn't sound to me like, you know, like abstaining because it's a political question. It seems to me like deciding the case. Do you want to answer? We do think that the — whether the Court's looking at it as a political question or whether the Court's looking at it as a judgment on the merits, the issue is textual commitment. This is — there is textual commitment. This is a situation in which the country has to speak with one voice and the executive has to determine what the country should say. Thank you. Thank you, counsel. Mr. Lewin will give you 6 minutes. Thank you, Mr. Chief Justice. Let me begin my rebuttal by echoing really what Justice Alito said during my colleague's argument. The question is whether anything that the President thinks bears on recognition forecloses this Court or any court from making that determination. This is not, in our view, a recognition case. This is a passport case. The question is what goes on the passport and may somebody self-identify? This is, again, if one looks at the statute, if one even looks at the foreign affairs manual, a passport is not today considered a diplomatic statement. It's an identification of a person in order to enable them to travel abroad. Now, again, let me also echo what the Chief Justice and Justice Kagan asked during my colleague's argument. If, in fact, the statute had said, we don't say Jerusalem is part of Israel, but you can identify yourself as being in Israel, Mike, we submit that result can very easily be achieved and was achieved in the case of Taiwan by a public statement by the executive. Congress, this law can be enacted. People who were born in Jerusalem can have their passport say either Jerusalem or Israel. That's their choice. Congress hasn't said it has to say Israel. And then the Department of State can issue, as it did in the case of Taiwan, a public statement saying this is not official American policy. Nobody is asking this Court to decide what is official American policy. Nobody is asking the Court to decide what, as Justice Scalia said, would happen if there were no congressional statute. In that case, it would be a political question. If my client had decided he wanted to have his passport say Israel and he had no congressional statute, and we brought the case to a court, the court could say, no, you're asking us to decide what the President should decide, what the Department of State should decide. But other than that, Congress has enacted the law. The fact is that with regard to this legislation, it is a statute which determines personal choice with regard to a passport. The case can be a vehicle, this case can be a vehicle for an authoritative clarification of the roles of Congress and the President in conducting the nation's foreign affairs. If so, then we submit Justice Jackson's statement, which acknowledges that Congress has the final word in the third category, is one that should control. But there are narrower grounds for enforcing Section 214d that do not implicate separation of powers issues. It's a passport law. It's within Congress's constitutional authority under cases that have recognized that the President may not deny or restrict passports without the express or implied approval of Congress. That doesn't require the recognition or involve the recognition of foreign sovereigns. And the State Department's justification for a policy that Congress has disapproved does not withstand scrutiny. The Court merely has to look at the record in this case in which the State Department has said, look, we're concerned that there may be a misperception of what this means. A misperception. And it's extraordinary that on the basis of the fact that there's an alleged misperception, American citizens who have been authorized by Congress to say, identify themselves on their passports as being born in Israel, will now find that statute. Sotomayor, could you tell me, let's assume that a dozen nations said, this designation on the passport is, we view as an act of war. If the United States is going to do this, we're going to view it as an act of war. Would that then permit the President to ignore Congress's discretion? Congress has to weigh that, and if Congress determines that in any event this is what the passport should say, then that is Congress. Sotomayor, so it's not the misperception that's at issue? Well, in this case, we just say that the misperception has nothing to do with your argument. I don't think that's true, because you're going back to Justice Scalia's point, which is what you're saying is Congress dictates foreign policy in the end. In the end, if Congress determines that what the President has said in this context is wrong, yes, we live in a system under which Congress passes the law, and the President has the duty, and I think Justice Scalia has said it, has the duty to be the sole instrument of foreign policy. The President speaks for the foreign policy that when Congress authorizes him to do it, he may formulate it. When Congress does not authorize him to do it, he may formulate it. But when Congress disapproves of what he does, then under Justice Jackson's test in the Steel Seizure case, Congress prevails. The fact that there is dictum in cases, and particularly Curtis Wright, which has not come up in the course of the argument, but Justice Sutherland's opinion in the Curtis case, which is the most broadly of the President as being the sole organ of foreign policy, one has to say that the Harvard professor, Thomas Reed Powell, who used to tell his students that just because Justice Sutherland writes clearly, you must not suppose that he thinks clearly.  Kennedy, I have just one question on Washington's recognition of revolutionary friends. You cite in the reply brief the fact that the Administration was simply following what it deemed to be a dictate of international law. Do you want to infer for that that he was not exercising a real discretion? Correct. The historians who studied that have determined that he was just following Mr. Vettel who said you have to recognize any country that has de facto control, and therefore, since the French revolutionists were in de facto control of the French government, Washington had no choice. He was not exercising any kind of discretion. Thank you, counsel. The case is submitted.